Filed 6/25/21  P. v. Sobonya CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047112 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. ME000057) |
| v. | |
| JACK STEVEN SOBONYA, | |
| Defendant and Appellant. | |

A jury found appellant Jack Steven Sobonya to be a sexually violent predator within the meaning of the Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.), and he was committed to the Department of State Hospitals for an indeterminate term.[1]  On appeal, Sobonya argues that the trial court should have dismissed the petition to commit him as a sexually violent predator because he was not in lawful custody when the petition was filed, his trial counsel rendered ineffective assistance by failing to timely object to expert testimony about a diagnosis of sexual sadism, and his indeterminate commitment violates his right to federal and state due process of law, double jeopardy, and the ex post facto clause.  As we explain, we find no merit in Sobonya's contentions and affirm the judgment.

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

## I. BACKGROUND

### A. *Sobonya's Commitment to Prison and the SVP petition*

On January 19, 2012, Sobonya was sentenced by the Santa Cruz County Superior Court to nine years in prison for one count of sale of a controlled substance (Health & Saf. Code, § 11352, subd. (a)(1)) and two counts of sale of marijuana (Health & Saf. Code, § 11360, subd. (a)(2)).

On May 7, 2015, the Santa Cruz County District Attorney's Office filed a petition for Sobonya's commitment as a sexually violent predator (SVP) under the SVPA (§ 6600 et seq.). The petition was based on Sobonya's two 1995 convictions for committing lewd or lascivious acts on a child under 14 years of age (Pen. Code, § 288a) and a conviction for kidnapping (Pen. Code, § 207) and was supported by the evaluations of two psychologists, Dr. Siobhan Donovan and Dr. Roudabeh Rahbar, who determined that Sobonya met the criteria of an SVP as described in section 6600, subdivision (a).[2]

### B. *The Demurrer to the Petition*

On June 18, 2015, Sobonya's trial counsel filed a demurrer to Santa Cruz County's SVP petition, arguing that it was defective on its face because Sobonya was not in lawful custody when it was filed. According to the demurrer, Sobonya was scheduled to be released from custody for his Santa Cruz County substance abuse offenses on

---

[2] The Santa Cruz County petition alleged that Sobonya qualified as an SVP based on his two convictions for committing a lewd and lascivious act on a child under the age of 14 (Pen. Code, § 288a) and did not mention his conviction for kidnapping (Pen. Code, § 207). The petition, however, incorporated by reference the evaluations prepared by Dr. Donovan and Dr. Rahbar. The two evaluations listed Sobonya's conviction for kidnapping (Pen. Code, § 207) as a qualifying offense under the SVPA. Dr. Donovan's evaluation also listed a conviction of Penal Code section 311.4 as a qualifying offense, but a violation of Penal Code section 311.4 is not a sexually violent offense as defined under section 6600, subdivision (b).

2

March 19, 2015, nearly two months before the Santa Cruz County District Attorney's Office filed its SVP petition.

The People opposed the demurrer and argued that a timely SVP petition had been initially filed in Ventura County on March 13, 2015, when Sobonya was still in custody, Sobonya did not complain about venue when the Ventura County petition was filed, and even if Sobonya was not in lawful custody when the Santa Cruz County petition was subsequently filed, Sobonya's unlawful custody was the result of a good faith mistake of fact or law as described under section 6601, subdivision (a)(2).

After considering the parties' arguments, the trial court denied Sobonya's demurrer and concluded that either the Ventura County petition was valid and timely filed, or the Ventura County petition was invalid but Sobonya's unlawful custody was the result of a good faith mistake under section 6601, subdivision (a)(2).

## C. The Probable Cause Hearing

On April 27, 2016, the trial court held a hearing and determined that there was probable cause to believe that Sobonya was likely to engage in sexually violent predatory behavior upon his release (§ 6602, subd. (a)) and set the matter for a trial.

## D. The Trial

### 1. The Prosecution's Case

#### a. Sobonya's Sexual Offenses

In 1992, when Sobonya was around 42 years old, he kidnapped a three-year old girl, A., who was playing on her front lawn. Sobonya pulled his car over and told A. that he would show her a squirt gun if she went into his car. Afterwards, Sobonya drove A. over to his mother's house, took off A.'s clothes, and touched "his bottom on her bottom." Sobonya rubbed lotion over A.'s genitals and put his penis in her mouth. Sobonya then dropped A. off in a different neighborhood. A.'s mother, R.G., testified

3

that she remembered that A. was scared and crying after she was found. Sobonya was later convicted of kidnapping A. Sobonya and A. had no prior relationship.

In 1992, Sobonya was arrested after he approached a four-year-old girl and a five-year-old girl in an alleyway. Sobonya drove up to the two girls in a truck that had a sign that said "Free Kittens." Sobonya told one of the girls that he wanted one of them first, and he would come back for the other girl. There were witnesses near the alleyway who were able to intervene before anything could happen. Inside the truck was a surgical glove and a toy.

Also in 1992, Sobonya was arrested for prostitution after he offered to pay an undercover police officer $10 to orally copulate him.

In 1993, Sobonya lived with S.W.'s mother. S.W. was 14 years old at the time. Sobonya regularly made comments to S.W. about the size of his penis, offered to show S.W. a tattoo on his penis, and made comments about S.W.'s body and wanting to have sex with her. Sobonya told S.W. about having sex with a 15-year-old girl and described it as "a lot of fun." S.W. repeatedly told Sobonya to stop making these kinds of statements. Sometimes Sobonya made inappropriate comments in front of his girlfriend, D., who lived behind S.W.'s mother's house. S.W. recalled that Sobonya was very friendly with her younger sister, C.

In 1994, Sobonya and D. were friends with B.'s mother. B. testified that he was nine years old at the time, and his sister T. was approximately two years older than him. B. recalled that Sobonya filmed him and his sister while they ate big popsicles. Sobonya told B. and his sister how to eat the popsicles and directed them to "go deeper, to lick the tip." Sobonya filmed B. eating popsicles twice, once outside in Sobonya's truck and another time close to B.'s house. B. also recalled an incident in 1994 where Sobonya was supposed to take him fishing. Instead of going fishing, Sobonya took B. to a motel. When they were inside the motel, Sobonya brought out a video camera, a blonde wig, and

4

a dildo. Sobonya placed the camera on a dresser and recorded B. sucking on the dildo while wearing the wig. Afterwards, Sobonya asked B. to massage him.

In 1995, Sobonya was convicted for some of the offenses that he committed between 1992 and 1994, including the qualifying sexual offenses of kidnapping A. (Pen. Code, § 207) and two counts of committing a lewd and lascivious act on a child under the age of 14 for the acts involving B. (Pen. Code, § 288a), and he received a sentence of 17 years 8 months.

In 2005, Sobonya was charged with around 25 offenses for sexually assaulting S.W.'s sister, C. Sobonya had videotaped and photographed himself sexually assaulting C., and he later buried the videos in the backyard of the house that he was living in sometime around 1993. S.W. testified that C. was around four years old in 1993. The videos and photographs were found approximately 10 years later. The charges against Sobonya were dismissed after C. died in a car accident.

By stipulation, the jury heard descriptions of the contents of the videos and photographs of Sobonya's assaults against C. The pictures that were found depicted C. naked in various sexual positions. The videos showed Sobonya forcing C. to orally copulate him, Sobonya orally copulating C.'s vagina and anus, Sobonya digitally penetrating C., and Sobonya penetrating C.'s vagina with his penis. C. is heard on the video saying, " 'I don't want to do it,' " and she " 'doesn't feel good.' " In one of the videos, C. walks away, and Sobonya is heard ordering her to " 'get back over there.' "

In 2004, Sobonya was admitted to Atascadero State Hospital as a mentally disordered offender. In 2006, he purposefully brushed both of his arms against the breasts of a female staff member. In 2007, he had a "persecutory perception and accusatory behavior with female staff."

5

Sobonya was at Atascadero State Hospital until 2008, when he was determined to be no longer dangerous and released into the community. Sobonya was homeless after he was released.

In 2010, Henry Donnelly worked in Santa Cruz and often walked by the beach on his way to work. One day, a woman at his work told Donnelly, " 'You have a convicted child molester living in the parking lot.' " Donnelly saw Sobonya looking from a cliff at children participating in the Little Guards and Junior Guards program. Donnelly called the police and reported what he saw. Several weeks later, Donnelly saw Sobonya speaking to a woman who had three children, and Donnelly called the police again.

Also in 2010, Juan Cuevas Badilla met Sobonya while waiting for parking spots near a beach that he frequented. Badilla later learned that Sobonya was a sex offender, and he distanced himself from Sobonya and tried to avoid having conversations with him. In August 2010, Badilla noticed that Sobonya was parked at the beach and was taking either pictures or videos of a mother and her two young children getting out of their wetsuits. Badilla estimated that the children were around five years old. Badilla went to the police station and filed a report. Nothing happened to Sobonya after Badilla made the police report. Eventually, Badilla cooperated with police officers, wore a wire, and purchased drugs from Sobonya, which led to his arrest for several substance abuse offenses.

Santa Cruz County Sheriff's Office Sergeant Mark Yanez searched a storage locker used by Sobonya after he made the drug sale to Badilla. Inside the locker, Sergeant Yanez found marijuana, scales, and some other items. Sergeant Yanez also searched Sobonya's car. Sergeant Yanez found a Palm cell phone that had a video of a girl changing out of her wetsuit. The video was approximately a minute long, and Sergeant Yanez believed that the girl in the video was between 11 and 14 years old.

6

In 2010, Katrina Rogers was a police officer with the Santa Cruz County Police Department and was the lead investigator assigned to Sobonya's case. Officer Rogers spoke with Badilla about his complaint about Sobonya's conduct. A three-week investigation, which included surveillance, was launched following Badilla's complaint, but aside from the video recovered on Sobonya's phone, Officer Rogers did not find evidence that Sobonya had committed any other sexual offense.

b. *Dr. Donovan's Testimony*

Dr. Donovan testified as an expert in the field of psychology, psychiatry, and sexually violent predators. She diagnosed Sobonya with pedophilic disorder and antisocial personality disorder. A person with a pedophilic disorder has, over a period of at least six months, "sexual fantasies, behaviors, urges of prepubescent children" and acts on "those fantasies, urges," which causes "interpersonal difficulty." Dr. Donovan opined that Sobonya had "pedophilic disorder, nonexclusive, attracted to both" because his victims were both male and female. Dr. Donovan explained that a person with antisocial personality disorder has a pervasive pattern of violating others' rights. According to Dr. Donovan, research showed that having both antisocial personality disorder and pedophilic disorder results in a "big increase in recidivism." A person with both disorders has "no remorse for their actions" and does not "care about any consequences."

Dr. Donovan wrote several reports for Sobonya's case. Her most recent report was prepared on April 30, 2019, several months before Sobonya's trial. In preparation for this report, Dr. Donovan reviewed records from Sobonya's prison file, prison medical file, and Department of State Hospitals file. Dr. Donovan interviewed Sobonya in 2015, but he declined to be interviewed in 2019.

Dr. Donovan opined that Sobonya's kidnapping offense placed him in the "extremely high" spectrum of dangerousness because "the majority of offenders aren't plucking children off of their front lawn as they play" and usually have some sort of

7

relationship with their victims.  The fact that A. was a stranger spoke to Sobonya's impulsiveness and inability to control his behavior.  With respect to the offenses against B. and T., Dr. Donovan opined that Sobonya "established a relationship with [B.] in order to sexually offend against [him]."

Dr. Donovan read a narrative report that summarized the contents of the video showing Sobonya's sexual assaults against C. and watched the first minute of the video. Dr. Donovan characterized Sobonya's behavior as "extreme deviant sexual behavior." After considering the sexual assaults involving C., Dr. Donovan opined that she would "really strongly consider an additional diagnosis of sexual sadism" for Sobonya. Dr. Donovan referred to the narrative report of the video as "truly one of the worst things I've ever read."

Dr. Donovan found Sobonya's behavior in 2010, where he watched and videotaped minors, "clinically significant to suggest that he still has these deviant sexual . . . interests in children, which makes him . . . a serious and well-founded risk." Dr. Donovan also testified that in 2010, Sobonya was associating with another registered sex offender.

In 2015, Dr. Donovan interviewed Sobonya, and Sobonya recounted that when he was 12 years old, he gave a three-year-old child a bath and touched the child in a lewd and lascivious manner.  Sobonya denied that he kidnapped A.  When asked about the offenses involving B. and T., Sobonya denied penetrating the children and said, " 'I left the video at home when I went surfing.  The mother found the dildo.' "  Sobonya also said, " 'I was so screwed up on coke, I went crazy.' "  When asked about the incidents involving C., Sobonya said, " 'I filmed a three-year-old who is dead giving me head.' " Dr. Donovan believed that Sobonya's deviant sexual interests and his lack of remorse for his actions spoke to his overall pathology to violate children.

Sobonya attributed his actions between 1992 and 1994 to his cocaine use. Sobonya had a substance abuse problem, and he started using cocaine when he was 17 years old. Sobonya, however, told Dr. Donovan that he last used cocaine in 1992. During a drug group session, Sobonya said that he had been clean and sober since 1993. These statements were inconsistent with Sobonya's assertion that he had been using cocaine when he committed the offenses against B. and T. in 1994. Dr. Donovan opined that cocaine did not drive Sobonya's deviant sexual interests and that there are "plenty of people that use cocaine and don't go out and—sexually offend against kids."

Dr. Donovan reviewed Sobonya's criminal history, which began when he was 15 years old and committed drug offenses. Sobonya had a history of recidivism, and he had repeated arrests and offenses that showed deceitfulness and a disregard for the safety of other people. Starting in 1973, when he was 23 years old, Sobonya committed crimes like credit card fraud and check fraud.

Dr. Donovan also testified about Sobonya's social history. Sobonya identified as a heterosexual and denied that he had a sexual interest in children. When describing his family life, Sobonya said that he was a " 'screw-up,' " and he often got into trouble as a child for cutting classes. Sobonya had an unstable work history, and the longest job that he ever held was for two years. Sobonya once worked as a janitor at an elementary school, which Dr. Donovan found concerning because it gave him access to children. Sobonya had one significant relationship with a woman named D. He married D. in 1993 and divorced her in 2001. Sobonya had two children with D. Dr. Donovan opined that Sobonya's age—69 years at the time of trial—did not have an effect on his pedophilic interests.

Dr. Donovan discussed Sobonya's past treatment for his disorders. Sobonya was sent to Coalinga State Hospital in 2015 or 2016. In 2017, Sobonya regularly attended a self-regulation group and attended a drug group. Sobonya attended the first day of a

9

"behavior in change or thinking group," but he subsequently left.  Dr. Donovan spoke to Sobonya's treating psychologist, and the psychologist said that Sobonya did not interact with him, and although Sobonya attended groups, he did not want to be there and did not actively participate.  Sobonya told the treating psychologist that he wanted to return to the community, he was not a pedophile, and he had already completed treatment at Atascadero State Hospital.  In 2019, Dr. Donovan called Coalinga Sate Hospital and received updates about Sobonya.  At the time, Dr. Donovan was told that Sobonya participated actively and independently in groups.

Dr. Donovan opined that Sobonya's pedophilic disorder and antisocial personality disorder caused volitional impairment, resulting in the commission of sexual crimes. Furthermore, Sobonya had a "serious and well-founded risk . . . of sexual reoffense." Dr. Donovan gave Sobonya a score of seven on the Static-99, which is "well above average risk."[3]

### c. *Dr. Rahbar's Testimony*

Dr. Rahbar reviewed Sobonya's prison records, state hospitalization records, probation records, and arrest reports.  Dr. Rahbar opined that Sobonya had proper qualifying offenses, a diagnosable mental disorder, and there was a well-founded risk that he would reoffend if released into the community.  Dr. Rahbar diagnosed Sobonya with pedophilic disorder, nonexclusive type, sexually attracted to females.

Dr. Rahbar reviewed Sobonya's criminal history, including the offenses involving A., the offenses involving S.W. and C., and the offenses involving B. and T.  Dr. Rahbar concluded that Sobonya's behaviors showed that he had a "pattern of arousal and a

---

[3] Dr. Donovan testified that the Static-99 is a tool used to evaluate risk of recidivism and considers various factors including a person's age at release, whether the person has lived with someone or has been single, whether the person had a nonsexual violent offense, and whether the person had a prior sex offense.

pattern of sexual desire towards prepubescent young female children." Dr. Rahbar met with Sobonya once, but Sobonya denied subsequent interview requests. During his one meeting with Dr. Rahbar, Sobonya denied the incidents that happened with S.W. and denied that he fondled or orally copulated A. Sobonya spoke about his qualifying sex offenses in a "matter-of-fact way; like it was as if [he] would tell the Court, Oh, I went and had a cup of coffee this morning at Starbucks."

Dr. Rahbar talked to Sobonya's treatment provider at Coalinga State Hospital and Sobonya's social worker, and both said that they would not be comfortable releasing Sobonya into the community. Sobonya's social worker said that Sobonya was still minimizing his offenses and was not actively participating in treatment. In 2015, Sobonya told Dr. Rahbar that he did not need sex offender treatment.

Dr. Rahbar opined that Sobonya's 2010 offenses, which involved him videotaping and observing minors, were a "foundation building block[] of possibly engaging in a qualifying sex offense." Sobonya had a history of being a voyeur and the fact that he was engaging in similar behavior again was "predictive of future behavior."

Dr. Rahbar reviewed Sobonya's medical files from Coalinga State Hospital. Sobonya had coronary artery disease, hypertension, and hyperlipidemia, but his conditions were currently stable under his medication regimen.

Dr. Rahbar gave Sobonya a score of five on the Static-99, placing him in the above average risk category.

### 2. *The Defense's Case*

Dr. Carolyn Murphy testified for the defense as an expert in SVP evaluations and forensic psychology. Dr. Murphy reviewed the reports prepared by Dr. Donovan and Dr. Rahbar. She disagreed with Dr. Donovan's conclusion that Sobonya had an antisocial personality disorder. According to Dr. Murphy, there was no evidence that

11

Sobonya had very delinquent conduct before the age of 14, which is required for such a disorder.

Dr. Murphy was not aware of studies that showed a direct link between antisocial personality disorder and pedophilic disorder. Dr. Murphy believed that there was evidence to suggest that Sobonya had a pedophilic disorder in 2016, but she questioned whether the diagnosis remained current.

Sobonya did not commit sexual offenses until he was around 42 years old, and his offenses ended when he was 44 years old. Dr. Murphy characterized this as "very unusual for someone who is reported to have some sort of . . . compelling deviant interest in children."

Dr. Murphy interviewed Sobonya in 2016 and met him again in 2018 during one of her trips to Coalinga State Hospital. During an interview, Sobonya told Dr. Murphy that he was on drugs when he committed his offenses, but he clarified that he was not blaming the drugs. Dr. Murphy believed that Sobonya wanted to help her understand "why in [Sobonya's] early forties and just in that very discrete period of time do we see this pattern of very abhorrent conduct." Sobonya indicated that he was open to pursuing treatment after he was released. Dr. Murphy opined that someone who has pedophilia may act on their urges only when under the influence, and drugs and alcohol are substances that lower a person's inhibitions.

Dr. Murphy reviewed Sobonya's records from Atascadero State Hospital. Sobonya was found to be a mentally disordered offender and underwent treatment at Atascadero, and it was Dr. Murphy's understanding that he was evaluated to be no longer dangerous and was released from the program. At Atascadero, Sobonya went through "cognitive behavioral interventions," which Dr. Murphy described as "sex offender treatment that has been tailored for that particular population." Sobonya was in the

12

community for over two years without reoffending until he was arrested in 2010 on drug charges.

Dr. Murphy did not believe that Sobonya's offenses in 2010 were similar to the acts that he committed between 1992 and 1994. The offenses in 2010 involved older children. The video that Sobonya took showed a child who was "not three, a teenager, perhaps a young adult." Dr. Murphy also opined that if the "junior little lifeguards" that Sobonya was reported to be observing were prepubescent, his actions "may [possibly] indicate continued interest" in children, but "if there's no acting out on that otherwise it doesn't necessarily add support for continued risk or that one would actually act on it." Dr. Murphy asserted that if the lifeguards were "postpubescent, even if they're teenagers, that's not considered deviant."

Dr. Murphy testified that there are three protective factors that are related to recidivism, including a person's age, his or her medical condition, and whether he or she has been in the community for 10 years without reoffending. According to Dr. Murphy, age starts to impact recidivism starting at around age 50. Sobonya was already 69 years old. The average life expectancy for a man is around 76 years, and Dr. Murphy opined that when "someone is approaching close to 70 they don't have much time left at risk." Sobonya's medical history showed that he needed to be in a medical hospital because of his high blood pressure, high heart rate, breathing problems due to coronary artery disease, and peripheral arterial disease. Sobonya had previously suffered two heart attacks. Dr. Murphy opined that health conditions can reduce a person's desire to reoffend and their ability to reoffend. Sobonya had not been in the community for 10 years before he was rearrested on the drug charges, so the last protective factor was inapplicable. Thus, Dr. Murphy concluded that Sobonya had two out of the three protective factors.

13

Dr. Murphy also noted that Sobonya's qualifying sex offenses occurred during a two-and-a-half year cluster when he was reportedly under the influence of cocaine. In Dr. Murphy's opinion, Sobonya's drug use was another factor to consider in terms of what needed to be controlled and changed to reduce Sobonya's risk of reoffending. Dr. Murphy believed that Sobonya had been treated for his drug abuse problem and was currently in remission. Dr. Murphy gave Sobonya a score of six on the Static-99.

Based on everything that she reviewed, Dr. Murphy concluded that Sobonya did not qualify as an SVP under the SVPA.

Sobonya did not testify on his own behalf.

## E. The Verdict

On June 28, 2019, the jury found the petition alleging that Sobonya met the criteria as a sexually violent predator as defined under the SVPA to be true. The trial court thereafter ordered Sobonya returned to the Department of State Hospitals pursuant to the SVPA.

## II. DISCUSSION

### A. The Filing of the SVP Petition and Good Faith Mistake of Law or Fact

Sobonya argues that the SVP petition that was filed in Santa Cruz County should have been dismissed because he was not in lawful custody when it was filed. He further argues that his unlawful custody was not the result of a good faith mistake of fact or law as described under section 6601, subdivision (a)(2). The People argue that substantial evidence supports the trial court's conclusion that Sobonya's unlawful custody was the result of a good faith mistake and the petition should not be dismissed.

### 1. Background

On June 18, 2015, Sobonya's trial counsel filed a demurrer to Santa Cruz County's SVP petition, arguing that it was defective on its face because Sobonya was not in lawful custody when it was filed. According to the demurrer, Sobonya was scheduled

14

to be released from custody for his Santa Cruz County substance abuse offenses on March 19, 2015, nearly two months before the Santa Cruz County District Attorney's Office filed its SVP petition.

The People responded to the demurrer and argued that the Ventura County District Attorney's Office had filed a timely SVP petition before Sobonya's scheduled release date. The People explained that an SVP petition was initially filed in Ventura County because that is where Sobonya committed his qualifying sexual offenses under the SVPA. It was later determined that Santa Cruz County was the correct venue, and the Ventura County Superior Court transferred the case to Santa Cruz County. The Santa Cruz County District Attorney's Office filed its own SVP petition on May 7, 2015. The People argued that Sobonya's demurrer should not be sustained because Sobonya did not complain about venue when the SVP petition was first filed in Ventura County. The People further argued that even if Sobonya was not lawfully in custody when the Santa Cruz County SVP petition was filed, the petition should not be dismissed because Sobonya's unlawful custody was the result of a good faith mistake of fact or law as described under section 6601, subdivision (a)(2).

Attached to the People's opposition was a declaration prepared by Ventura County Deputy District Attorney Paul Feldman. Feldman asserted that he had received a packet from the Department of State Hospitals on March 13, 2015, requesting that his office file an SVP petition against Sobonya. Feldman's office filed the petition on March 16, 2015. Sobonya was transported to court and arraigned on March 19, 2015 in Ventura County. Sobonya's trial counsel requested that the case be continued until April 9, 2015. On April 9, 2015, Sobonya appeared in court again, and his trial counsel again continued the case until April 23, 2015 with a time waiver. On April 23, 2015, Sobonya's trial counsel requested another continuance until April 28, 2015 with a time waiver. On April 24, 2015, Feldman realized that the Department of State Hospitals may have made

15

a mistake because it appeared that Santa Cruz County "had proper jurisdiction" over Sobonya's SVP petition. Feldman contacted the Department of State Hospitals "and was informed that an error had occurred and the case should have been sent to the County of Santa Cruz as they were the last county of commitment for Mr. Sobonya." Feldman filed a motion to transfer the case to Santa Cruz County on April 27, 2015, which the Ventura County Superior Court granted on April 28, 2015.

Also attached to the People's opposition was a minute order from the Ventura County Superior Court that supported Feldman's timeline of events. The minute order showed that an SVP petition was filed in Ventura County on March 16, 2019. The minute order also showed that Sobonya was present in court in Ventura County on March 19, 2015, for proceedings relating to the petition. According to the minute order, the matter was transferred to Santa Cruz County on April 28, 2015.

On June 23, 2015, Sobonya's trial counsel responded to the People's opposition. Trial counsel argued that "an SVP petition is proper in any county where the sex offender was convicted, not just the most recent one," and because Sobonya was convicted of offenses in Ventura County in 1995, "the filing of the petition in Ventura County was proper." Thus, trial counsel argued that "there [was] no mistake and the SVP petition should be handled, if handled at all, in Ventura County." Trial counsel insisted that the Santa Cruz County petition was untimely filed, and the Santa Cruz County petition should be dismissed.

On June 26, 2015, the trial court held a hearing on Sobonya's demurrer. Sobonya's trial counsel argued that he had never seen the petition filed in Ventura County, and it was unclear whether Santa Cruz County complied with the SVPA. The People argued that the SVP petition was timely filed in Ventura County because the Ventura County minute order reflected that the petition was filed on March 16, 2015, and Sobonya's last day of custody was March 19, 2015. The People also argued the initial

16

filing in Ventura County was "certainly a mistake that was made in good faith, because . . . the language [in the Welfare and Institutions Code] is deceptively complicated." The People noted that Sobonya personally appeared in court in Ventura County and made no objections "concerning the petition or jurisdictional issues."

After considering the parties' arguments, the trial court denied Sobonya's demurrer. The trial court made the following conclusions: "[T]here's two different ways to look at it. One, Ventura County filed the petition timely and the case was transferred here, which I don't think necessitated the need for a new petition. The court can transfer cases, and the receiving court receives it and takes over jurisdiction in its entirety. So if I look at it from that perspective, we're on track and the extra petition filed here in Santa Cruz County doesn't hurt but isn't the date that I would look at. And then time has been waived, and we're still within the guidelines. [¶] The other way to look at it would be Ventura never had authority. That petition filed there and what happened there has no authority or value here. And the petition filed here in Santa Cruz County was untimely. Well, 6601(a)(2) of the Welfare and Institutions Code indicates that a petition shall not be dismissed on the basis of a later judicial determination that custody was unlawful—and I'm paraphrasing somewhat—if based on good faith mistake, or additional fact or law. . . . [¶] This allows the court here to say if, in fact, it's untimely filed when he wasn't in lawful custody, was this a good faith mistake of law or fact? And I think it is, based on the confusing nature of the different provisions we're looking at."

### 2. *Santa Cruz County Was the Correct Venue To File the SVP Petition*

First, Sobonya argues that the SVP petition was erroneously filed in Ventura County. We agree with Sobonya that Santa Cruz County, not Ventura County, was the correct venue to file the SVP petition.

"The SVPA requires that a person be in custody when the initial commitment petition is filed." (*Langhorne v. Superior Court* (2009) 179 Cal.App.4th 225, 235

17

(*Langhorne*); § 6601, subds. (a)(1), (a)(2).)  Section 6601, subdivision (a)(2) provides in pertinent part:  "A petition may be filed under this section if the individual was in custody pursuant to his or her determinate prison term, parole revocation term, or a hold placed pursuant to Section 6601.3, at the time the petition is filed."

Under section 6601, subdivision (i), an SVP petition "shall be filed in the superior court of the county in which the person was convicted of the offense for which he or she was committed to the jurisdiction of the Department of Corrections and Rehabilitation."

In 2012, Sobonya was convicted in Santa Cruz County and sentenced to prison for one count of sale of a controlled substance (Health & Saf. Code, § 11352, subd. (a)(1)) and two counts of sale of marijuana (Health & Saf. Code, § 11360, subd. (a)(2)).  The Santa Cruz County offenses were the offenses for which Sobonya was committed to prison when the SVP petition was filed.  Thus, Santa Cruz County, not Ventura County, was the correct venue for Sobonya's SVP petition.  (See *Cheek v. Superior Court* (2002) 103 Cal.App.4th 520, 525-526 [SVP petition can be properly filed in any of the counties in which the person was convicted of the offense for which he or she was committed to prison].)

### 3.  *Good Faith Mistake Under Section 6601, Subdivision (a)(1)*

The trial court determined that even if the Ventura County SVP petition was invalid and Sobonya's custody was unlawful at the time the Santa Cruz County SVP petition was filed, Sobonya's unlawful custody was the result of a good faith mistake of fact or law as described under section 6601, subdivision (a)(2).

#### a.  *General Legal Principles*

An express good faith exception to the custody requirement is provided in section 6601, subdivision (a)(2), which states in pertinent part:  "A petition shall not be dismissed on the basis of a later judicial or administrative determination that the

18

individual's custody was unlawful, if the unlawful custody was the result of a good faith mistake of fact or law."

"In view of [this] provision, when an untimely petition is filed and the individual is held beyond the end of his prison or parole revocation term (and any section 6601.3 hold) in order to facilitate the sexually violent predator proceedings, 'the custody becomes unlawful and the petition must be dismissed unless the unlawful custody resulted from a good faith mistake of fact or law.' " (*People v. Superior Court (Sokolich)* (2016) 248 Cal.App.4th 434, 446 (*Sokolich*).)

"[T]he phrase ' "good faith" ' as incorporated in section 6601(a)(2) is 'generally understood "to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation. [Citations.]" [Citation.] In other words, good faith is " 'a state of mind indicating honesty and lawfulness of purpose: belief in one's legal title or right: belief that one's conduct is not unconscionable . . . .' " ' " (*Sokolich*, *supra*, 248 Cal.App.4th at p. 446.) "The existence of good faith is determined by the circumstances existing at the time of the alleged good faith act, and 'not by virtue of hindsight.' " (*Langhorne*, *supra*, 179 Cal.App.4th at p. 239.)

In *Langhorne,* this court applied the good faith mistake provision in a situation where the inmates' unlawful custody arose from the People's filing of improper motions to convert two-year commitment terms to indeterminate terms because the record demonstrated that the People attempted to faithfully comply with their obligations under the SVPA and there was no appellate court decision construing the amendments to the SVPA at the time the improper motions were filed. (*Langhorne*, *supra*, 179 Cal.App.4th at p. 239.) The good faith mistake provision, however, has been found inapplicable in situations where the record demonstrates a lack of good faith—for example, where an inmate's unlawful custody arose from the failure to make timely mental health referrals

19

that was the result of an increased workload on the Department of Corrections and the Department of Mental Health. (See *People v. Superior Court (Small)* (2008) 159 Cal.App.4th 301, 310 ["increased workload does not amount to a mistake of law or fact and is something that the Department of Corrections and the Department of Mental Health could have anticipated and prepared for"].)

Appellate courts have also interpreted the good faith mistake provision to encompass negligent mistakes. In *Sokolich*, *supra*, 248 Cal.App.4th 434, an SVP petition was untimely filed on the day that the inmate was scheduled to be released because the State Department of Mental Health listed the wrong release date when it recommended filing an SVP petition. (*Id.* at p. 439.) The Second Appellate District concluded that although there was "some evidence of negligence[] in view of the district attorney's office policy directing attorneys to obtain confirmation from the DCR regarding release dates . . . . mere negligence in determining the release date does not establish the absence of good faith." (*Id*. at p. 451.) The record in *Sokolich* reflected "no intentional wrongdoing, subjective dishonesty, or improper motive, but rather diligent efforts by the district attorney's office to file the petition in a timely manner." (*Id.* at p. 452.)

In coming to its decision, *Sokolich* determined that the statutory language of section 6601, subdivision (a)(2) supported the conclusion that good faith does not require the absence of negligence. (*Sokolich*, *supra*, 248 Cal.App.4th at p. 448-449.) "Negligence is ordinarily assessed by reference to reasonableness, viewed objectively. The general standard of care applicable to negligence is ' "that of a reasonably prudent person under like circumstances" ' [citation], which constitutes an 'objective reasonable person standard' [citation]. " (*Id.* at p. 447.) "[N]egligence ordinarily hinges on whether the pertinent person complied with that standard, rather than on the person's state of mind," and "[i]t is thus possible to make a negligent mistake while acting in good faith." (*Ibid.*)

20

*Sokolich* also examined the legislative history of the good faith mistake provision, which was described in the California Supreme Court's decision in *In re Smith* (2008) 42 Cal.4th 1251. (*Sokolich, supra*, 248 Cal.App.4th at p. 449.) In *Smith*, the Supreme Court noted that when section 6601, subdivision (a)(2) was added to the SVPA, the "legislative committee analyses made clear that it was intended to adopt a rule similar to the holding in [*People v. Superior Court (Whitley)* (1999) 68 Cal.App.4th 1383]." (*Smith, supra*, at p. 1260). In *People v. Superior Court (Whitley), supra*, at pages 1389-1390 (*Whitley*), the appellate court held that the inmate should not be released even though it was later determined that his parole had been erroneously revoked before the SVP petition was filed. In coming to its conclusion, *Whitley* determined that there was nothing to indicate that there was "negligent or intentional wrongdoings" committed by the Department of Corrections when it revoked the inmate's parole. (*Id.* at p. 1391.)

*Smith* observed that the legislative analyses further stated: " 'The issue that generated this bill arose in the context of a mistake of law about [psychiatric parole revocations]. Such an error is arguably merely [a] technically error, as an inmate who appears to be an SVP would likely be subject to very rapid proper revocation of parole upon release from custody. Similar problems could raise if a court decision rules that good-faith sentencing credit calculations were made in error. [¶] The Attorney General, the co-sponsor of the bill, notes that this bill should also address analogous mistakes of fact. For example, a simple mistake in arithmetic in the calculation of credits could result in an untimely filing of an SVP petition. The Attorney General argues that such a good-faith error should not result in the release of [an] SVP who presents a substantial danger to the public.' " (*Smith, supra*, 42 Cal.4th at p. 1261.) The Assembly Republican bill analysis also stated: " 'The bill responds to an ambiguity created by an appellate court decision and makes it clear that sexually violent predators are not to be unleashed on society simply because "the constable has blundered." ' " (*Ibid.*)

21

*Sokolich* observed that *Whitley* relied on good faith *and* the absence of negligent or intentional wrongdoing in its decision.  (*Sokolich*, *supra*, 248 Cal.App.4th at p. 448; *Whitley*, *supra*, 68 Cal.App.4th at p. 1390, 1391-1392.)  However, *Sokolich* concluded that the legislative history as described in *Smith* "contains no suggestion that the term 'good faith' . . . requires the absence of negligence."  (*Sokolich*, *supra*, 248 Cal.App.4th at p. 449.)  "Although some courts have affirmed a finding of a good faith mistake of law under the rationale stated in *Whitley*, none examined whether the existence of a negligent mistake of law or fact, by itself, would nullify good faith."  (*Ibid.*; see *In re Lucas* (2012) 53 Cal.4th 839, 852-858)  In fact, "[t]he legislative history supports the reasonable inference that the term 'good faith mistake' was intended to encompass technical errors, custody credit miscalculations, and even 'blunder[s]' manifesting no wrongful intent." (*Sokolich, supra,* at p. 449)

### b.  *Standard of Review*

"We review the trial court's finding of good faith under the substantial evidence standard of review."  (*Langhorne*, *supra*, 179 Cal.App.4th at p. 238.)  " '*Good faith*, or its absence, involves a factual inquiry into the plaintiff's subjective state of mind [citations]: Did he or she believe the action was valid?  What was his or her intent or purpose in pursuing it?  A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence.  Because the good faith issue is factual, the question on appeal will be whether the evidence of record was sufficient to sustain the trial court's finding.' "  (*Id.* at pp. 238-239.)

### c.  *Application of Section 6601, Subdivision (a)(2)*

In this case, the trial court expressly determined that Sobonya's unlawful custody was the result of a good faith mistake under section 6601, subdivision (a)(2).  We conclude that substantial evidence supports this factual determination.

Feldman's declaration and the Ventura County Superior Court's minute order reflect that the parties acted in good faith when the SVP petition was initially filed in Ventura County. According to Feldman, he received a packet from the Department of State Hospitals requesting that he file an SVP petition on March 13, 2015, before Sobonya's scheduled release date, and, relying on the request, Feldman filed an SVP petition while Sobonya was still in custody. The Ventura County Superior Court's minute order shows that Feldman's office and the trial court proceeded on the petition as if it were filed in the correct venue. Sobonya was appointed counsel, and Sobonya's own trial counsel initially raised no objection or concerns about the petition. Sobonya was transported from prison and appeared in court in Ventura County. Feldman moved to transfer the matter to Santa Cruz County after he discovered that the Department of State Hospitals had sent the request to Ventura County by mistake.

Sobonya argues that the Ventura County District Attorney's office engaged in " 'egregiously unreasonable conduct.' " However, the language of the statute itself is susceptible to confusion over the correct venue. Section 6601, subdivision (i) states that the SVP petition should be filed "in the superior court of the county in which the person was convicted of the offense for which he or she was committed to the jurisdiction of the Department of Corrections and Rehabilitation." The SVPA deals with sexual offenses, and Sobonya's qualifying sexual offenses were committed in Ventura County. In fact, Sobonya's trial counsel at one point argued to the trial court that *Ventura County*, not Santa Cruz County, was the appropriate venue for this very reason—because Sobonya's qualifying sexual offenses were committed in Ventura County. As the trial court observed, the existence of a good faith mistake was supported by the "confusing nature of the different provisions we're looking at."

The record reflects that Feldman moved to transfer the matter to Santa Cruz County once he discovered that a mistake had been made. Even assuming that the

23

Ventura County District Attorney's Office was negligent in failing to thoroughly examine the Department of State Hospital's request or to research the requirements of section 6601, subdivision (i), which would have led to the discovery of the mistake at an earlier time, we agree with *Sokolich* that "mere negligence . . . does not establish the absence of good faith." (*Sokolich*, *supra*, 248 Cal.App.4th at p. 451.) Neither the legislative history nor the statutory language of section 6601, subdivision (a)(2) reflects an intent to exclude good faith mistakes that are negligent, and it is "possible to make a negligent mistake while acting in good faith." (*Sokolich*, *supra,* at pp. 448-449.) In this case, the record does not reflect any "intentional wrongdoing, dishonesty, or improper motive" when the Ventura County District Attorney's Office filed the SVP petition. (*Id.* at p. 452.)

Accordingly, substantial evidence supports the trial court's factual finding that the People made a good faith mistake by filing the SVP petition in Ventura County. Thus, the exception described under section 6601, subdivision (a)(2) precludes the dismissal of the commitment petition filed in Santa Cruz County.[4]

### B. *Ineffective Assistance of Counsel*

Sobonya argues that his trial counsel rendered ineffective assistance because he failed to timely object to Dr. Donovan's testimony that she would "seriously consider adding sexual sadism as a diagnosis." The People argue that there was no basis for trial

---

[4] Sobonya also argues that there was no showing of good cause for a 45-day extension to file a SVPA under section 6601.3, and even if there was a showing of good cause, the Santa Cruz County petition was not filed until 48 days after his original discharge date. The Santa Cruz County District Attorney's office, however, never requested an extension under section 6601.3. Furthermore, given our decision that the good faith mistake provision of section 6601, subdivision (a)(2) applies, Sobonya's unlawful custody does not warrant dismissal of the SVP petition. We also do not need to reach the People's alternative arguments that Sobonya forfeited his right to complain that Ventura County was an improper venue for the SVP petition and that Sobonya waived his right to challenge the timeliness of the SVP petition filed in Santa Cruz County.

24

counsel to object to Dr. Donovan's testimony, and, in any event, any deficient performance was not prejudicial.

### 1. *General Principles and Standard of Review*

To prevail on an ineffective assistance of counsel claim, Sobonya must establish that trial counsel's performance was deficient and that he suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id*. at p. 688.) Regarding prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

### 2. *Background*

At trial, Dr. Donovan testified about the video that Sobonya made of his sexual assaults against C. Dr. Donovan had viewed the first minute of the video and had read a narrative description of the video's contents. Dr. Donovan stated: "So after I read [the description of the video], honestly, like it made me think that he fits into different diagnoses, different paraphilias, so sexual sadism or we call it other specific paraphilic disorder, nonconsent, where you are essentially sexually aroused by—especially for sexual sadism, you're sexually aroused by the fact that you're causing the—the other

25

person pain." Dr. Donovan also testified, "I would really seriously consider adding sexual sadism as a diagnosis."

The prosecutor asked Dr. Donovan, "For our discussion right now, I want you to assume that [sexual sadism] is a diagnosis, I want to talk about the combination, then, of pedophilia, the paraphilia of sadism and now the antisocial personality disorder. [¶] First off, where does that put him on the percentage of offenders, that—that triple combination?" Dr. Donovan testified, "That puts him on the pretty rare side of sex offenders." Dr. Donovan, however, added that this additional diagnosis might change some of Sobonya's additional risk factors but it would not "change particularly [his] Static-99" score.

Next, the prosecutor asked Dr. Donovan about how the combination of sexual sadism and antisocial personality disorder typically manifests. At that point, defendant's trial counsel asked for a sidebar. During the sidebar, trial counsel argued that Dr. Donovan had not written about a diagnosis of sexual sadism in her reports, and her testimony was an "ambush." Thus, trial counsel objected to Dr. Donovan's testimony "under [Penal Code section] 1054 and under due process." The prosecutor responded that Dr. Donovan had not stated that she intended to change her diagnosis on the stand, and the prosecutor did not recall Dr. Donovan telling him specifically about her opinion on sexual sadism. The prosecutor explained, "This is just a dynamic conversation we are having on the stand." The trial court concluded: "There is a fairness aspect that I am concerned about. I think the point has been made about where this gentleman rests on this spectrum, and she has made a point about all of three of these factors and [the prosecutor] will move onto other topics."

Later, Dr. Donovan reiterated during cross-examination that she did not diagnose Sobonya with sexual sadism and attested, "I have not changed my diagnosis . . . ." Dr. Donovan testified: "I mean, I think that looking back on the evidence that I was

26

given and especially the evidence from the—the videotape of [C.], that evidence isn't any of the details of that crime wasn't stuff that I had before when I did my report, and I would—I would really strongly consider a diagnosis of sexual sadism for [Sobonya] based on the facts of that video . . . ."

Trial counsel also cross-examined Dr. Donovan about the definition of sexual sadism under the DSM-V,[5] which requires " 'recurrent and intense sexual arousal from the physical or psychological suffering of another person as manifested by fantasies, urges, or behaviors' " over a period of six months. Trial counsel pointed out that Dr. Donovan had considered only "evidence of one act," which did not suggest that the behaviors had been exhibited over a period of six months. Dr. Donovan again reiterated that she did not diagnose Sobonya with sexual sadism, but she believed that he "strongly meets some of the criteria." Trial counsel also pointed out that the definition of " '[s]exual sadism involving nonconsenting others, i.e. multiple victims' " in the DSM-V has been generally " 'interpreted as three or more victims on separate occasions.' " Trial counsel asked Dr. Donovan whether she had evidence of only one victim, C., on one occasion. Dr. Donovan asserted that she would also consider A. to be a victim, but she again reiterated, "I didn't give him a diagnosis of sexual sadism, but I would strongly, again, consider it . . . ."

3. *Analysis*

Sobonya argues that his trial counsel's performance was deficient because he failed to timely object to Dr. Donovan's testimony about sexual sadism. He argues that an earlier objection would have been meritorious under Penal Code section 1054.1 because the prosecutor had access to information about the video of the sexual assaults

---

[5] Dr. Donovan testified that the DSM is a "diagnostical statistical manual" that describes "diagnoses that we use in the psychological and psychiatric community."

27

against C. for "years prior to trial," and Dr. Donovan's testimony on the subject was "an ambush and inconsistent with the quest for truth."

Under Penal Code section 1054.1, subdivision (f), the prosecutor must disclose "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."

Penal Code section 1054.1 applies to criminal cases. "The SVPA establishes a 'civil commitment scheme covering persons who are to be viewed, "not as criminals, but as sick persons." ' [Citation.] Thus, an SVPA proceeding is civil in nature." (*People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 988.) "The Civil Discovery Act applies in both 'a civil action and a special proceeding of a civil nature' " like the SVPA. (*Ibid.*) Nonetheless, "[w]hile the Civil Discovery Act is applicable in SVPA proceedings, the right to civil discovery in special proceedings of a civil nature remains subject to the trial court's authority to manage discovery." (*Id.* at p. 988-989.)

Assuming that that Penal Code section 1054.1 is applicable here, Sobonya does not demonstrate that an objection on that ground would have been meritorious. There is no dispute that the prosecutor in this case disclosed the reports prepared by Dr. Donovan to Sobonya's trial counsel. Although the prosecutor did not disclose that Dr. Donovan intended to testify that she would strongly consider adding a diagnosis of sexual sadism, the record reflects that the prosecutor himself was unaware that Dr. Donovan intended to testify on that subject. During the sidebar with the trial court, the prosecutor indicated that he was merely having a "dynamic conversation" with Dr. Donovan when she brought up the subject of sexual sadism.

28

Additionally, this is not a situation where the record affirmatively discloses that there was no rational, tactical explanation for trial counsel's failure to make an earlier objection. When Dr. Donovan initially testified that she was considering adding a diagnosis of sexual sadism, trial counsel may have believed that he could appropriately respond to Dr. Donovan's testimony during cross-examination. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 506 [competent counsel may forego valid objection for tactical reason].) Additionally, trial counsel may have legitimately thought that objecting to the challenged remarks would serve to only draw further attention to Dr. Donovan's opinion about sexual sadism. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 206 [finding no ineffective assistance of counsel when counsel's failure to object could be explained as a tactical decision not to draw the jurors' attention to comments by the prosecutor].) " '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings." (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.)

Indeed, trial counsel effectively cross-examined Dr. Donovan on the subject of sexual sadism and highlighted the deficiencies in her testimony. Trial counsel asked Dr. Donovan about the definition of sexual sadism in the DSM-V, which requires fantasies, urges, or behaviors that manifest over a period of six months. Trial counsel asked Dr. Donovan if she only had evidence of one act with C. Trial counsel also pointed out that the definition of "[s]exual sadism involving nonconsenting others, i.e. multiple victims" in the DSM-V, is generally " 'interpreted as three or more victims on separate occasions.' " Dr. Donovan testified that she believed A. was also a victim, but she did not have evidence of three victims. Trial counsel's cross-examination not only illustrated that Dr. Donovan's opinion about sexual sadism did not meet the definition of the disorder as described under the DSM-V, but also elicited Dr. Donovan's repeated assertions that she had not diagnosed Sobonya with sexual sadism.

29

Accordingly, Sobonya does not meet his burden to show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Strickland*, *supra*, 466 U.S. at p. 688.)

Sobonya also does not meet his burden to show that trial counsel's failure to make an earlier objection resulted in prejudicial error. Sobonya argues that evidence that he was likely to engage in sexually violent offenses in the future was weak, and Dr. Donovan's testimony that she was considering adding sexual sadism as a diagnosis was "incredibly prejudicial" because it indicated that he suffered from a third diagnosis and "essentially obliterated [Dr.] Murphy's testimony and made it impossible for the jury to accept [Dr.] Murphy's conclusion that [he] was not likely to engage in sexually violent offenses in the future."

We disagree with Sobonya's characterization of Dr. Donovan's testimony. As we have already stated, Dr. Donovan admitted on cross-examination that Sobonya's acts did not satisfy all the criteria required for a diagnosis of sexual sadism as described in the DSM-V. She also admitted several times that she was not diagnosing Sobonya with sexual sadism. Dr. Donovan further testified that an additional diagnosis of sexual sadism might change some of Sobonya's additional risk factors, but it would not "change particularly [his] Static-99" score.

In fact, Dr. Donovan's testimony about sexual sadism was no more prejudicial than the description of the contents of the videotapes that involved C. The jury was informed that the videos showed that Sobonya forced C. to orally copulate him, Sobonya orally copulated C.'s vagina and anus, Sobonya digitally penetrated C., and Sobonya penetrated C.'s vagina with his penis. The jury was also informed that C. says in the video, " 'I don't want to do it' " and she " 'doesn't feel good.' " Even without Dr. Donovan's testimony about sexual sadism, the video summary provided undisputed

30

evidence that Sobonya had committed sexual offenses against C. over her objection and without her consent.

Sobonya also argues that it was prejudicial for Dr. Donovan to testify that she considered A. to be a victim that fit within the sexual sadism diagnosis. The jury, however, was already presented with evidence that Sobonya kidnapped A., took off A.'s clothes, and touched "his bottom on her bottom." Dr. Donovan testified that Sobonya rubbed lotion over A.'s genitals and put his penis in her mouth. Afterwards, Sobonya dropped A. off in a neighborhood, where she was later found crying. R.G., A.'s mother, testified that A. was scared and crying after the incident. Dr. Donovan's additional testimony about the offenses that were committed against A. did not, as Sobonya suggests, portray him as being more dangerous than what was already presented in the evidence. The jury could already reasonably infer based on the evidence that the offenses committed against A. were done against her will.

Finally, Sobonya insists that the evidence presented at trial that he was likely to engage in sexually violent offenses in the future was weak because his qualifying offenses took place during a concise time frame, between 1992 and 1994. The jury, however, could logically conclude that the discrete timing of Sobonya's offenses was due in large part to the fact that he was incarcerated for his qualifying offenses following his conviction in 1995 and was not released from prison until 2008. Sobonya had no opportunity to reoffend while he was incarcerated. Sobonya was homeless after he was released in 2008 and was in the community for over two years without reoffending until he was arrested in 2010 for drug charges. However, preceding his 2010 arrest, Sobonya viewed and videotaped minors without their consent.

We recognize that Dr. Murphy's testimony supported Sobonya's position that there were multiple protective factors in his favor including his age and medical condition. We also recognize that Dr. Murphy opined that Sobonya's drug use, which

31

she believed was in remission, should be considered when evaluating his actions because drug and alcohol use can lower inhibitions. Nonetheless, as we have discussed, the jury was presented with evidence from two experts that Sobonya qualified as an SVP. Dr. Donovan's additional remarks about sexual sadism were not particularly probative or prejudicial and were largely cumulative of the evidence that was already presented at trial.

As a result, Sobonya has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

C. ***Constitutionality of the Indeterminate Commitment Under the SVPA***

Lastly, Sobonya contends that the SVPA, as amended in 2006 to provide for an indeterminate term of commitment and as amended in 2013 regarding the procedure for unconditional release (Stats. 2013, ch. 182, § 3), violates the due process, ex post facto and double jeopardy clauses. He acknowledges that the California Supreme Court has rejected due process, ex post factor and double jeopardy challenges to the SVPA in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*), but states that our Supreme Court erred and he wishes to preserve these issues for federal review.

1. ***Due Process***

In *McKee I,* the Supreme Court determined that a person subject to an indefinite commitment under the amended SVPA is not deprived of due process because he or she has the burden, after the initial commitment, to show by a preponderance of the evidence that he or she no longer meets the statutory criteria for commitment as an SVP. (*McKee I, supra,* 47 Cal.4th at p. 1191.) The *McKee I* court also found no merit in the contention that the trial court's discretion to deny as frivolous a committed person's petition for conditional release pursuant to section 6608, subdivision (a) violates due process. (*McKee I, supra,* at p. 1192.) Finally, the *McKee I* court construed the amended SVPA to

32

implicitly provide for the appointment of a state-funded mental health expert when a committed person petitions for release under section 6608, subdivision (a), and that as so construed, "it does not violate the due process clause." (*McKee I, supra,* at p. 1193.)

Sobonya contends that the ability of a committed person to petition for unconditional release under section 6608 is not an adequate remedy for a due process violation. However, in *McKee I* the Supreme Court stated, "We construe statutes when reasonable to avoid difficult constitutional issues. [Citation.] After Proposition 83, it is still the case that an individual may not be held in civil commitment when he or she no longer meets the requisites of such commitment. An SVP may be held, as the United States Supreme Court stated under similar circumstances, 'as long as he is both mentally ill and dangerous, but no longer.' [Citation.]" (*McKee I, supra,* 47 Cal.4th at p. 1193.)

Accordingly, based on the decision in *McKee I, supra,* 47 Cal.4th 1172, we conclude that the current version of the SVPA does not violate the due process clause. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*).)

### 2. *Ex Post Facto and Double Jeopardy*

Sobonya contends that the amended SVPA violates the ex post facto and double jeopardy clauses of the California and United States Constitution because "the SVP Act now amounts to punishment." This contention has no merit.

In *McKee I,* the California Supreme court reiterated its decision in *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 that the SVPA was not punitive because it had two nonpunitive objectives, "treatment for the individual committed and protection of the public." (*McKee I, supra,* 47 Cal.4th at p. 1194.) After examining the amended SVPA, the *McKee I* court determined that "the Proposition 83 amendments at issue here cannot be regarded to have changed the essentially nonpunitive purpose of the [SVPA]," and therefore that the amended SVPA does not violate the ex post facto clause. (*Ibid.*)

33

In light of the California Supreme Court's holding in *McKee I* that the amended SVPA is not punitive in nature, Sobonya's double jeopardy claim is likewise without merit. (See *People v. Carlin* (2007) 150 Cal.App.4th 322, 348, italics omitted [California Supreme Court's determination that SVPA is not punitive " 'removes an essential prerequisite for both . . . double jeopardy and ex post facto claims' "].)

We therefore find that the SVPA does not violate the ex post facto or double jeopardy clauses of the United States Constitution. (*Auto Equity Sales, supra,* 57 Cal.2d at p. 455.)

### III. DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
DANNER, J.

*People v. Sobonya*
**H047112**